IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

FILED IN CHAMBERS
U.S.D.C. ROME

Date: Feb 19 2021

JAMES N. HATTEN, Clerk

By: s/Kari Butler

Deputy Clerk

GLENN MICHAEL O'NEAL, JR.,

      Plaintiff,

    v.

CITY OF HIRAM and JODY
PALMER,

      Defendants.

CIVIL ACTION FILE NO.

4:19-CV-0177-TWT-WEJ

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff, Glenn Michael O'Neal, Jr., filed this action against his former employer, the City of Hiram ("the City"), alleging six claims: (1) violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA") (Am. Compl. [9] Count I); (2) discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA") (Am. Compl. Count II); (3) retaliation in violation of the ADEA (id. Count III); (4) discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and Rehabilitation Act, 29 U.S.C. § 701 et seq. ("Rehab Act") (Am. Compl. Count IV); (5) retaliation in violation of the ADA and Rehab Act (id. Count V); and (6)

violation of the Georgia Whistleblower's Act, O.C.G.A. § 45-1-4 ("GWA") (Am. Compl. Count VI).  Plaintiff also brings a claim under 42 U.S.C. § 1983, alleging that defendant Jody Palmer, the City Manager, violated his rights under the First Amendment to the United States Constitution.  (Am. Compl. Count VII.)

In its Answer to the Amended Complaint [16], the City asserted state-law counterclaims for breach of contract and unjust enrichment based on plaintiff's nonpayment of his health care premiums.  (Ans. to Am. Compl., Countercl., Counts I & II.)

This matter is before the Court on (1) a Motion for Summary Judgment [88] filed by the City and Mr. Palmer and (2) plaintiff's Cross-Motion for Summary Judgment as to the City's Counterclaims [93].  For reasons explained below, the undersigned **RECOMMENDS** that defendants' Motion be **GRANTED** as to plaintiff's federal claims, that the District Judge **DECLINE** to exercise supplemental jurisdiction over plaintiff's state-law GWA claim and the City's state-law counterclaims, and that plaintiff's Cross-Motion for Summary Judgment as to the City's Counterclaims be **DENIED AS MOOT**.

## I.  **PRELIMINARY ISSUES**

### A.  **Defendants' Objections to Unauthenticated Exhibits and Plaintiff's Declaration**

Plaintiff filed sixty-one exhibits ([109-1]-[109-61]), comprising several hundred pages, to his summary judgment brief, statement of additional facts, response to defendants' statement of undisputed material facts, and to his Declaration [109-5].  Defendants filed an Objection [118] to certain paragraphs of plaintiff's Declaration and, in their Reply Brief [117], objected to Plaintiff's Exhibits 2, 3, 4, 7, 9, 11, 21, 22, 24, 25, 27, 28, 29, 30, 31, 32, 36, 41, 43, 46, 51, 52, 53, 55, 58, 59, 60, 61, 62, and 63 [1] as unauthenticated and inadmissible hearsay. (Defs.' Reply 1-2.)  Defendants argue that only Exhibits 8 and 10 [2] are authenticated and are thus the only exhibits the Court should consider.  (Id. at 1.)

A court "may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial."  The Lamar Co. v. City of Marietta, Ga., 538 F. Supp. 2d 1366, 1377 (N.D. Ga. 2008); see also Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (plaintiff could not

---

[1] Plaintiff omitted Exhibits 6 and 42.

[2] Exhibits 8 and 10 are audio recordings that plaintiff made during meetings with Mr. Palmer (Pl.'s Ex. 8 [109-7]) and Chief Vande Zande (Pl.'s Ex. 10 [109-9]).

use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial).   While defendants are correct that plaintiff's exhibits are unauthenticated, defendants do not show how these exhibits cannot be authenticated at trial and thus the Court will consider them.  However, to the extent that plaintiff's exhibits contain hearsay or other inadmissible evidence that cannot be reduced to admissible form, the Court will exclude that content from consideration when appropriate.

Turning to plaintiff's Declaration, defendants object to ¶¶ 21, 33, 35, 49, 59, 62, and 64.[3]  Paragraph 21 reads:   "Mr. Palmer told me to keep up with the investigation." (O'Neal Decl. ¶ 21.)  Defendants object to this paragraph to the extent that plaintiff claims Mr. Palmer made this statement during an October 11, 2017 meeting.  Defendants' objection is sustained.  In his deposition, plaintiff was asked what he remembered Mr. Palmer saying to him during their October 11, 2017 meeting to discuss his grievance.  In response, plaintiff said he did not remember

_____

[3] Plaintiff did not file a Response to defendants' Notice of Objections [118]. Under the Local Civil Rules, failure to file a response indicates that plaintiff does not oppose defendants' Objections.  See N.D. Ga. Civ. R. 7.1(B) (failure to file a response to a  party's motion "shall indicate that there is no opposition to the motion.").  Although the Court sustains defendant's objections to ¶¶ 21, 33, 35, 49, 59, 62 and 64 on the merits infra, it also sustains them for this additional reason.

"word for word," but that he recalled Mr. Palmer telling him to "keep up with what was going on." (O'Neal Dep. [90] 134:3-136:23.) He further testified that there was nothing that could refresh his recollection of their conversation. (Id.) Given the clear answers to unambiguous questions that plaintiff provided in his deposition testimony, the Court rejects the averment in ¶ 21. See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

For the same reasons, the Court rejects ¶ 35 as a sham to the extent plaintiff claims he met in person with outside investigators more than once. (Compare O'Neal Decl. ¶ 35 ("I was interviewed by SPI investigators multiple times throughout the investigation, including phone calls and in-person meetings."), with O'Neal Dep. 112:10-114:12 (plaintiff testified he was only interviewed by investigators "in person" once).); see also Van T. Junkins & Assocs., Inc., 736 F.2d at 657.

Defendants' objections to ¶¶ 49, 59, and 62 are also sustained. These averments by plaintiff are not based on personal knowledge as required by Federal

5

Rule of Civil Procedure 56(c)(4).  See Pace v. Capobianco, 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("[A]n affidavit stating that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that fact.").  Plaintiff shows no basis for personal knowledge of what the EEOC investigated or who took over his work duties while he was on leave.  (O'Neal Decl. ¶¶ 49, 59, and 62.)

Defendants' objection to ¶ 64 is also sustained.  Paragraph 64 reads:  "Ms. [Mayor] Philyaw told me not to attempt to go back to work because Mr. Palmer was planning to fire me."  (O'Neal Decl. ¶ 64.)  This is hearsay that falls into no exception.  Fed. R. Evid. 802.

Finally, defendants object to ¶ 33.  Paragraph 33 states:  "I worked about ninety (90) hours while on FMLA leave between keeping up with my required emails, testimony, and research in the SPI[4] investigation, tasks assigned by the Chief, meetings with the Mayor, City Council, the City Manager, and mandatory training."  (O'Neal Decl. ¶ 33.)  Defendants argue that plaintiff provides no basis for how he determined he worked ninety hours during FMLA leave and that his

_____

[4] SPI is an outside investigation firm hired by the City to look into, inter alia, plaintiff's grievances.

6

Declaration contradicts his prior deposition testimony and sworn statements. Defendants' objection is sustained.

During his deposition, plaintiff repeatedly stated he could not recall the exact amount of time he had spent "keeping up" with emails, testimony, and research on the SPI investigation and claimed far less than ninety hours spent performing tasks assigned by the Chief and meeting with Mr. Palmer.  (O'Neal Dep. [90] 129:18-130:2 (unsure of time spent on emails), 114:21-115:15 ("maybe a couple of hours" spent meeting investigator), 144:2-25 ("maybe 30, 30 minutes" on task assigned by Chief Vande Zande), O'Neal Dep. Ex. 24 [90-24] ¶ 9 (one hour meeting with Mr. Palmer and Ms. Kendall to discuss his grievances).)  Plaintiff's Declaration also does not explain why it differs from his testimony in response to unambiguous questions.[5]

_____

[5] Although the Court sustained defendants' objections to the aforementioned paragraphs of plaintiff's Declaration, plaintiff only cites ¶¶ 21, 33, and 62 of that Declaration in support of PSAMF ¶¶ 10, 15, and 49, respectively.  The Court has excluded PSAMF ¶ 49 as immaterial.  (See infra note 7.)  The Court modified PSAMF ¶ 10 to reflect the record, not ¶ 21 of plaintiff's Declaration.  Finally, the Court has rejected PSAMF ¶ 15 because it is not supported by the record cited. (PSAMF ¶ 15 (citing O'Neal Decl. ¶ 33).)

## II.   **STATEMENT OF FACTS**

In support of their Motion for Summary Judgment, defendants as movants filed a Statement of Undisputed Material Facts ("DSUMF") [88-2].  See N.D. Ga. Civ. R. 56.1(B)(1).  As required by Local Civil Rule 56.1(B)(2)(a), plaintiff submitted a Brief [96] and a response to that statement of facts.  (See Pl.'s Resp. to DSUMF [96-1] ("PR-DSUMF").)  Further, as allowed by Local Civil Rule 56.1(B)(3), plaintiff submitted his own statement of additional facts.  (See Pl.'s Stat. of Add'l Material Facts [109] ("PSAMF").)  As required, defendants submitted a response.  (Defs.' Resp. to Pl.'s Stat. of Add'l Material Facts [120] ("DR-PSAMF").) [6]

The Court uses the parties' proposed facts and responses as follows.  Where one side admits a proposed fact, the Court accepts it as undisputed for purposes of this Report and Recommendation and cites only the proposed fact.  Where one side denies a proposed fact, the Court reviews the record cited and determines whether

---

[6] In compliance with the Local Civil Rules, the parties proposed facts regarding Plaintiff/Counterclaim Defendant's Cross-Motion for Summary Judgment [93].  (See Pl./Countercl. Def.'s Stat. of Facts in Supp. of Mot. for Summary Judgment [93-2]; Def. City's Resp. to Pl.'s Stat. of Facts in Supp. of Mot. for Summary Judgment [95-2]; and Def. City's Stat. of Add'l Material Facts [95-1].)  Because the undersigned **RECOMMENDS** that this Motion be **DENIED AS MOOT**, the proposed facts are not included herein.

a fact dispute exists. If the denial is without merit, and the record citation supports the fact, then the Court deems it admitted and includes it herein. The Court sometimes modifies a proposed fact per the record cited to reflect the fact more accurately. The Court excludes immaterial proposed facts[7] and excludes proposed facts that are stated as issues or legal conclusions [8] (see N.D. Ga. Civ. R. 56.1(B)(1)(c)). The Court endeavors to rule on all objections. Given their numerosity, however, it is not feasible to do so and keep this R&R at a manageable length. Thus, if the Court includes a proposed fact to which an objection has been asserted, one may assume the Court considered but overruled the objection. Finally, the Court considers all proposed facts in light of the standards for summary judgment, infra Part III.

### A.    Plaintiff's Employment and Leave

Plaintiff was formerly employed as a Lieutenant in the City's Police Department. (DSUMF ¶ 1.) On September 30, 2017, plaintiff requested to meet with City Manager Palmer away from City Hall and, during the meeting, advised

---

[7] PSAMF ¶¶ 1-3, 6, 12-13, 16, 25, 28, 34, 42, and 48-49 are excluded as immaterial.

[8] DSUMF ¶¶ 27 and 37 are excluded as legal conclusions. They are also immaterial given the undersigned's recommendation that any dispute over payment of premiums be resolved in state court.

Mr. Palmer of concerns he had about then-Chief of Police, Todd Vande Zande, and his alleged mistreatment of plaintiff and other members of the Police Department. (Id. ¶ 2; PSAMF ¶ 4.)  Plaintiff made a recording of this meeting with Mr. Palmer, a copy of which was filed as Plaintiff's Exhibit 8 [109-7].  The Court has reviewed the recording and finds that it supports the following proposed facts.

At the September 30, 2017 meeting, Mr. Palmer advised plaintiff that if he submitted a grievance in writing, then he (Palmer) would look into it.  (DSUMF ¶ 3, modified by PR-DSUMF ¶ 3; PSAMF ¶ 5, modified by Pl.'s Ex. 8.)  Mr. Palmer and plaintiff also discussed Chief Vande Zande's comments that plaintiff felt were improper about his education and weight.[9]  (PSAMF ¶ 5, modified by Pl.'s Ex. 8.)  The next day, October 1, 2017, plaintiff covertly recorded a conversation he had with the Chief, during which the Chief confided in him that he would be terminating Lieutenant Brian Acree (plaintiff's counterpart) based on false accusations Acree had made against the Chief during a meeting on September 9,

---

[9] According to plaintiff, Chief Vande Zande had said that he and another officer would need more education to maintain their rank of Lieutenant in the Police Department and should set an example by walking.  Plaintiff inferred from these comments that the Chief believed he was "fat and uneducated." (Pl.'s Ex. 8.)

2017 and his resistance to changes the Chief was attempting to implement in the Police Department.  (DSUMF ¶ 4, modified by PR-DSUMF ¶ 4.)

Shortly after his phone call with the Chief, plaintiff was hospitalized for chest pain, stress, and shortness of breath and remained hospitalized until October 4, 2017.  (PSAMF ¶ 7; DSUMF ¶ 5.)  Upon his release from the hospital, plaintiff went for a follow-up visit with Dr. Dailey Smith, who provided a note stating plaintiff would be unable to work from October 4, 2017 until October 23, 2017. (PSAMF ¶ 7, modified by DR-PSAMF ¶ 7.)   Plaintiff informed Sheila Kendall, who worked in human resources for the City, of his need for leave, and on October 5, 2017, she sent him short-term disability insurance forms to fill out.  (PSAMF ¶ 8.)

Plaintiff began his FMLA leave in early-October 2017.  (DSUMF ¶ 6, modified by PR-DSUMF ¶ 6.[10])  While on FMLA leave, plaintiff was not required to, or asked to, perform his normal job duties.  (DSUMF ¶ 7, modified by PR-DSUMF ¶ 7.)  Mr. Palmer testified that employees on FMLA leave are allowed to continue accessing their email for their own benefit but are not required to.  (Palmer

---

[10] As stated, defendants' proposed fact is a legal conclusion.  However, both parties agree that plaintiff's FMLA leave began in early-October 2017 and the actual start date will be addressed infra Part IV.D.

Dep. [85] 25:11-19.)  In PSAMF ¶ 15, plaintiff claims he worked about ninety hours while on FMLA leave, citing ¶ 33 of his Declaration.  However, as discussed supra Part I.A, ¶ 33 of plaintiff's Declaration is a sham.  Thus, the Court rejects PSAMF ¶ 15.  However, the undersigned derived the following facts based on defendants' Objection.  While on FMLA leave, plaintiff was contacted by Chief Vande Zande about the City's sale of a trailer (O'Neal Dep. 144:3-8) and contacted by Sergeant Dunbar to get information about a domestic violence victim (id. at 150:12-15).  Plaintiff also attended meetings with Mr. Palmer and Ms. Kendall (id. at 68:8-11) and a SPI investigator to discuss his grievances (id. at 152:6-11).  Finally, plaintiff was required to attend a meeting to enroll in health benefits. (Palmer Dep. 32:3-6, 32:25-33:1.)

After exhausting his FMLA leave, plaintiff was still unable to return to work, but was able to transition to unpaid leave pursuant to the City's Extended Additional Medical Leave policy.  (DSUMF ¶ 8. [11])  Plaintiff's leave from December 29, 2017 until his termination on October 9, 2018 was designated by the

---

[11] Plaintiff disputes the above proposed fact.  However, his dispute is not supported by the record cited.  Thus, the Court deems it admitted.

City as leave pursuant to the Extended Additional Medical Leave Policy.  (Id. ¶ 9, modified by PR-DSUMF ¶ 9.)

On December 18, 2017, Chief Vande Zande sent an email to Mr. Palmer and Ms. Kendall stating he could not hold plaintiff's position vacant any longer than required by law and requesting a date to discuss this issue with them. (PSAMF ¶ 17.)  On December 28, 2017, Mr. Palmer sent a certified letter to plaintiff stating that he may be required to undergo a "fitness for duty" examination from a provider selected by the City to ensure his physical and mental readiness to return to duty. (Id. ¶ 19, modified by DR-PSAMF ¶ 19.[12])  On January 31, 2018, plaintiff sent an email to Mr. Palmer stating:  "My Doctor will not release me to return to work.  I go back February 12th at 11am.  I'm requesting to give you an update then. . ." and asking Mr. Palmer what requirements plaintiff needed to complete to return to work. (PSAMF ¶ 20, modified by Pl.'s Ex. 39 [109-38].)  Mr. Palmer replied that he was reviewing the matter and would respond to plaintiff tomorrow. (PSAMF ¶ 20.)  On February 2, 2018, Mr. Palmer sent an email to plaintiff granting his request of

_____

[12] PSAMF ¶ 19 asserts that Mr. Palmer was referring to a newly-created policy enacted by Chief Vande Zande. However, this assertion is not supported by the cited evidence.  Mr. Palmer testified he was referring to the City Handbook's fitness for duty policy, not the police department's standard operating procedure that contained Chief Vande Zande's policy.  (Palmer Dep. 129:15-131:3.)

additional leave until February 12, 2018.  (Id. ¶ 21.)  Mr. Palmer also stated plaintiff "will need a full release from your doctor based on the job description the city provided [your doctor].   All other requirements must wait until you have been cleared by your physician." (Id., modified by Pl.'s Ex. 38 [109-37].)

Plaintiff was unable to return to his regular Lieutenant duties on October 9, 2018, a full year after first going out on leave.  (DSUMF ¶ 10, modified by PR-DSUMF ¶ 10.)  Mr. Palmer did not reach out to plaintiff the week before he was terminated to determine whether there were accommodations that could have been made so he could return to work.  (PR-DSUMF ¶ 10 (citing Palmer Dep. 191:20-192:2).)

**B.    Plaintiff's Grievances**

On October 4, 2017, Mr. Palmer received an email from then-Police Chaplain Rich Erdman, appearing to contain an "official grievance/statement" from plaintiff.  (DSUMF ¶ 11.)   After his release from the hospital, plaintiff submitted a written grievance to Mr. Palmer, dated October 5, 2017, reiterating plaintiff's concerns about the Chief and his hostile conduct towards employees, and plaintiff's belief that the Chief was going to terminate Mr. Acree in retaliation for Mr. Acree's prior complaint to Mr. Rockovitz.  (Id. ¶ 12.)  Prior to submitting his grievance, plaintiff requested a second meeting with Mr. Palmer at a water tower,

14

away from City Hall, to discuss his concerns.  (Id. ¶ 13.)  At this meeting on October 5, 2017, Mr. Palmer requested to see plaintiff's phone, had plaintiff submit his written grievance, and requested plaintiff meet with him at City Hall to discuss his grievance.  (Id.; PSAMF ¶ 9.)  On October 6, 2017, plaintiff sent an email to Mr. Palmer to "continue [his] written complaint" in which he expressed offense to a text message he had received from the Chief earlier that year, on January 5, 2017, that involved a video clip from the movie "Blazing Saddles," which plaintiff described as racially derogatory.  (DSUMF ¶ 14.)  Plaintiff's October 5 written grievance did not mention these text messages from Chief Vande Zande, and the text messages were not discussed at the water tower meeting, but Mr. Palmer specifically requested those text messages be submitted, which plaintiff did according to Mr. Palmer's instructions.  (PSAMF ¶ 11.)  Mr. Palmer had concerns about the text messages plaintiff had provided to him because Chief Vande Zande's screenshots of the same text messages indicated plaintiff had participated in the conversation, whereas plaintiff's screenshots showed that he had not.  (DR-PSAMF ¶ 18[13] (citing Palmer Decl. [88-4] ¶¶ 3, 6, 9-10).)

---

[13] PSAMF ¶ 18 claims that Mr. Palmer told SPI investigators he was concerned about the truthfulness of plaintiff's text messages but that he

Mr. Palmer and Ms. Kendall met with plaintiff on October 11, 2017 to discuss his grievance(s). (DSUMF ¶ 15.)  Although plaintiff was on FMLA leave at the time, he never expressed concern about participating in the October 11, 2017 meeting.  (Id. ¶ 16.)  At the meeting, Mr. Palmer told plaintiff to "keep up with what's going on." (PSAMF ¶ 10, modified by O'Neal Dep. 134:3-1326:23.)  After the meeting, plaintiff forwarded his covertly recorded conversation with the Chief from October 1, 2017 to Mr. Palmer for his consideration in connection with his grievances.  (DSUMF ¶ 17. [14])

On November 8, 2017, the City Council contracted with an outside agency, SPI, to investigate the Police Department turnover and complaints from several other officers about the Chief in early-October 2017, in addition to plaintiff's

---

backtracked from the story when SPI investigators questioned him if he had previously seen the messages.  Plaintiff cites to a redacted portion of SPI's investigation report. (Pl.'s Ex. 11 [109-10].) If the SPI investigation notes of their interview of Mr. Palmer exist unredacted, plaintiff did not cite to them.  Because this portion of the report is entirely redacted, the Court cannot determine if the fact is supported by the cited evidence, and thus excludes it.  See N.D. Ga. Civ. R. 56.1(B)(3)(b).  However, defendants' response includes relevant portions of Mr. Palmer's Declaration that relate to his concerns about plaintiff's texts.

[14] Plaintiff denies this proposed fact.  (PR-DSUMF ¶ 17.)  However, his denial does not refute defendants' proposed fact but, rather, seeks to explain plaintiff's motivation for making the recording.  Thus, DSUMF ¶ 17 is deemed admitted.

16

grievances.  (DSUMF ¶ 18; PSAMF ¶ 14.)   In early-December 2017, plaintiff agreed to meet with one of the investigators at his home and provided follow-up information related to his grievances and potential witnesses.  (DSUMF ¶ 19.) Nobody with the City ever directed plaintiff to meet with the investigator, nor did plaintiff tell the investigator he was on FMLA leave or otherwise medically unable to meet with him.  (Id. ¶ 20.[15])

On February 16, 2018, plaintiff received a text message from Chief Vande Zande's cellphone number with a photo depicting a chess board knocking down a king piece with the word "CHECKMATE" at the top.  (PSAMF ¶ 27, modified by DR-PSAMF ¶ 27.[16])

On February 26, 2018, plaintiff submitted another grievance against the Chief.  (DSUMF ¶ 21.)  On April 10, 2018, while still on medical leave, plaintiff filed a Charge of Discrimination with the EEOC without the assistance of counsel,

_____

[15] Plaintiff disputes this fact as stated.  (PR-DSUMF ¶ 20 (citing O'Neal Decl. [109-5] ¶ 55).)  In his Declaration, plaintiff states that he felt compelled to meet with the investigators because the City had hired them to, in part, investigate his grievances.  (O'Neal Decl. ¶ 55.)  While plaintiff may have subjectively felt he had to meet with SPI investigators, this does not show the City directed him to.

[16] The rest of PSAMF ¶ 27 is not supported by the record cited.  Rather, Mr. Palmer testified that he spoke with Chief Vande Zande about the February 16, 2018 text message and did not take further action because the Chief was on administrative leave with no plans for him to return to work.  (Palmer Decl. ¶ 22.)

asserting claims for discrimination and retaliation under the ADA and ADEA. (Id. ¶ 22.)  In his Charge, plaintiff stated he had complained to Mr. Palmer that Chief Vande Zande had created a hostile work environment, and that after he complained to Mr. Palmer, Chief Vande Zande retaliated against him due to his disability by requiring him to take a fitness for duty exam when he would return from medical leave. (PSAMF ¶ 29, modified by DR-PSAMF ¶ 29.)  Plaintiff never had to submit to a fitness for duty exam. (DSUMF ¶ 23.[17])

In late-April 2018, plaintiff emailed several complaints to Mr. Palmer and others, including Mayor Philyaw and members of the City Council (Kathy Bookout, Kathy Carter, Frank Moran, Derrick Battle, and Jeff Cole). (DSUMF ¶ 24.) In this email, plaintiff alleged that Mr. Palmer was not following up on his previous grievances against Chief Vande Zande; that Mr. Palmer told him there was an employee he wanted to get rid of via a fitness for duty exam; that Rickey Walraven had told him there was an employee falsifying records so that Mr. Walraven would not receive workers' compensation; and that he had met with EEOC investigators

_____

[17] Both Chief Vande Zande and Mr. Palmer told plaintiff he may be required to submit to a fitness for duty exam once he returned to duty (Pl.'s Ex. 16 [109-15], at 2; Palmer Dep. 129:21-24), but plaintiff never had to submit to one because he was terminated.  Thus, the record does not support plaintiff's denial of DSUMF ¶ 23.

about Mr. Palmer and Chief Vande Zande's actions.  (PSAMF ¶ 30, modified by Pl.'s Ex. 44 [109-42].[18])  In another email sent the same day, plaintiff accused Chief Vande Zande of interfering with the SPI investigation.  (PSAMF ¶ 30, modified by Pl.'s Ex. 33 [109-32].)  On April 29, 2018, plaintiff sent an email to the EEOC investigator, the Hiram City Council, and Mr. Palmer requesting a full outside investigation into the actions of Mr. Palmer, and alleging that he believed the City had misrepresented a workplace incident involving Mr. Walraven and a negligent City employee; that Mr. Palmer had been retaliating against him due to his participation in the SPI investigation; that Mr. Palmer had ignored his grievances against Chief Vande Zande regarding his health issues; and forwarding a copy of the email he had sent to a SPI investigator regarding the alteration of documents. (PSAMF ¶ 31.[19])  On April 30, 2018, plaintiff sent an email to Mr. Palmer, Ms. Kendall, SPI investigator Jim Baker, and city councilmembers informing them that he had forwarded his prior complaints to the EEOC.  (Id. ¶ 32.)

On May 8, 2018, Mr. Palmer emailed plaintiff a letter informing him that the City would need updated information from his treating physicians and requesting

---

[18] The Court includes this fact only to show that plaintiff sent an email containing these allegations, not for the truthfulness of the allegations asserted.

[19] This proposed fact is included for the same reasons stated supra note 18.

19

the return of the information by May 15, 2018.  (PSAMF ¶ 33, modified by Pl.'s Ex. 46 [109-44].)  On May 10, 2018, plaintiff emailed Mr. Palmer asking for an extension to provide this information, which Mr. Palmer granted.  (PSAMF ¶ 35, modified by O'Neal Dep. 187:23-188:5 & Ex. 36 [90-38], at 1.)

On May 30, 2018, plaintiff called Ms. Kendall to ask if human resources were involved in the new requests from Mr. Palmer and to tell her that he believed Mr. Palmer would be requesting the information from his doctors.  (PSAMF ¶ 36.) That same day, Mr. Palmer emailed plaintiff stating he had been informed of his call to Ms. Kendall, that plaintiff was the one responsible for requesting the information from his doctors as discussed in their previous communications, and that he was giving plaintiff new deadlines to submit the forms.  (Id. ¶ 37, modified by Pl.'s Ex. 46 [109-44].)  Mr. Palmer cautioned that "[t]he failure to provide the requested information by the deadlines stated herein (which are extended from the original deadlines) could result in further admini[s]trative action[s], up to and including termination of your employment," and telling plaintiff to contact him directly with any further communication about his medical leave.  (Pl.'s Ex. 46.)

Plaintiff then forwarded this email to the EEOC and alleged it constituted additional retaliation. (PSAMF ¶ 38.[20])

On May 31, 2018, the City responded to plaintiff's EEOC Charge, stating that Mr. Palmer had discovered plaintiff had deleted text messages in response to Chief Vande Zande's texts[21] that would have revealed he was a willing participant in the conversation, but did not address that Mr. Palmer had seen the text messages earlier and had requested that plaintiff send them in. (PSAMF ¶ 39, modified by DR-PSAMF ¶ 39.[22]) The next day, plaintiff filed another grievance against Mr. Palmer for retaliation and threats of termination and intimidation regarding his medical records. (PSAMF ¶ 40, modified by Pl.'s Ex. 48 [109-46].) The City responded that there was no procedure to file a grievance against a City Manager under the City Handbook because the City Manager's decisions were final. (PSAMF ¶ 40, modified by Pl.'s Ex. 48.)

---

[20] Defendants' hearsay objection is overruled.

[21] This refers to the text messages containing the Blazing Saddles excerpt.

[22] Plaintiff's EEOC Charge does not allege that Mr. Palmer was discriminating against him by requiring him to submit medical information or be fired or that Mr. Palmer was using the fitness for duty test to discriminate against him. (See Pl.'s Ex. 49 [109-47].)

On June 4, 2018, plaintiff sent an email to Ms. Kendall again asking if human resources were involved in Mr. Palmer's request that plaintiff fill out medical questionnaires.  (PSAMF ¶ 41, modified by Pl.'s Ex. 47 [109-45].)  Mr. Palmer responded, reiterating the requirement to return the forms and to direct all communications to him.  (PSAMF ¶ 41, modified by Pl.'s Ex. 47.)  On June 8, 2018, plaintiff sent another email to Mr. Palmer and others.  (DSUMF ¶ 25.)  In this email, plaintiff reiterated his concerns over human resources' involvement in his medical leave, questioned why he was required to fill out medical forms, and asking who was investigating his grievances about Mr. Palmer.  (O'Neal Dep. Ex. 62 [90-64], at 36-37.)

On August 16, 2018, plaintiff sent a letter to the EEOC outlining his concerns about Mr. Palmer's actions towards Mr. Walraven and how he believed Mr. Palmer was discriminating against him by threatening to have him take a fitness for duty exam and terminating his flex spending benefits. (PSAMF ¶ 43.[23])  On August 27, 2018, plaintiff sent another email to the EEOC claiming he was receiving more retaliation because he had requested that the City be investigated for changing the

---

[23] PSAMF ¶ 43 claims that this letter is plaintiff's EEOC Charge.  (Id., citing Pl.'s Ex. 51 [109-49].)  However, Exhibit 51 is not plaintiff's EEOC Charge— plaintiff's Charge is filed as Plaintiff's Exhibit 49 [109-47].

dates on the fitness for duty policy, that he had requested Frank Moran to be investigated, and his allegation that Mr. Palmer and Mr. Moran had interfered with the SPI investigation.  (Id. ¶ 44.)

### C.    Plaintiff's Health Benefits and the City Handbook

The City informed plaintiff that while he was on medical leave his City-sponsored health benefits would continue on the same terms as if he had continued to work, including that he would continue to be required to pay his share of the premiums.  (DSUMF ¶ 26, modified by PR-DSUMF ¶ 26.)  Plaintiff was subject to the policies in the City's Employee Handbook. (DSUMF ¶ 28.)  Until November 17, 2017, plaintiff utilized his accrued paid time off ("PTO") and continued to receive a paycheck from which his insurance premiums were deducted.  (Id. ¶ 29.)  After receiving his last paycheck, plaintiff did not make any more premium payments.  (Id. ¶ 30, modified by PR-DSUMF ¶ 30.)

On several occasions, Ms. Kendall reminded plaintiff that he needed to submit his premium payments to the City, beginning with the first pay period in December 2017.  (DSUMF ¶ 31, modified by PR-DSUMF ¶ 31.)  On February 6, 2018, plaintiff was notified that because he had not paid any of his benefit premiums since November 20, 2017 (his last paycheck), and owed the City $1,788.77 in past due premiums, the City would be terminating his voluntary Flex

Spending Account ("FSA"), which is 100% funded by the employee.  (DSUMF ¶ 32; see PSAMF ¶ 22.)  When plaintiff still had not paid any of his premiums for his remaining benefits through March 16, 2018, the City terminated his voluntary benefits which – like the FSA – were funded 100% by the employee.  (DSUMF ¶ 33, modified by PR-DSUMF ¶ 33.)  In response to Ms. Kendall's email, plaintiff responded:  "Please don't do this.  I have no other way to pay for my medication or Doctor's visits.  I have two doctors I go to and expensive medication." (PSAMF ¶ 24, modified by Pl.'s Ex. 40 [109-39] (email from plaintiff to Ms. Kendall).)

On February 7, 2018, Mr. Palmer sent plaintiff an email stating he had consulted with the City Attorney to confirm but his decision is based upon the City's policy, and that while the Handbook allowed the City to continue insurance benefits for an employee that is on extended leave, it did not authorize the funding of the FSA because it was not health insurance.  (PSAMF ¶ 23.)  Mr. Palmer was aware that plaintiff was still experiencing medical issues, yet he terminated plaintiff's FSA because plaintiff had not paid his premiums for it (Palmer Decl. ¶¶ 17-19), and "had made no effort in payment of his other obligations, so I didn't assume that this would be any different." (PSAMF ¶ 26, modified by Palmer Dep. 142:4-144:11.)

Plaintiff remained on the City's health and dental plans until his termination, and the City continued to pay both its share and his share of the premiums so his coverage would not lapse.  (DSUMF ¶ 34.)  Ms. Kendall sent a letter[24] on March 26, 2018 to plaintiff stating that he was still responsible for payment of his portion of the premiums, which amounted to a bi-weekly payment of $181.47.   (Id., modified by PR-DSUMF ¶ 34.)  At the time of plaintiff's termination in October 2018, the City had paid $5,282.94 for plaintiff's share of his benefit premiums during his unpaid medical leave.  (DSUMF ¶ 35.)  Plaintiff continued to receive and use his health and dental benefits for the duration of his unpaid medical leave. (Id. ¶ 36.)

Plaintiff sent an email to Ms. Kendall asking who made the decision to terminate his benefits and why he was being treated differently than another employee who was out for an extended period of time but did not lose any pay or benefits.  (PSAMF ¶ 24[25], modified by O'Neal Dep. Ex. 33, at 1.)  Ms. Kendall

---

[24] Ms. Kendall also attached a copy of the letter in an email to plaintiff on the same day.  (O'Neal Dep. Ex. 33 [90-35], at 2.)

[25] PSAMF ¶ 24 is worded so that plaintiff sent this response at the same time as his response to Ms. Kendall's February 6, 2018 email terminating his FSA. However, plaintiff did not mention another employee being treated differently until his response to Ms. Kendall's March 26, 2018 letter.

responded that Mr. Palmer made the decision in compliance with the City Handbook and that she needed the name of the employee plaintiff was referring to in order to address his question. (O'Neal Dep. Ex. 33, at 1.)  Plaintiff named the employee as Ricky Walraven, and Ms. Kendall explained that Mr. Walraven continued to receive his pay and benefits because he was out on FMLA leave and had PTO hours to cover his entire absence.  (Id.)

### D.    Plaintiff's Termination

At the time of his termination on October 9, 2018, plaintiff was still unable to return to work due to his medical condition(s), had exhausted all of his available leave, had been absent longer than what was contemplated by any leave provision in the City's Handbook, and it was unknown if or when he would be able to return to work.  (DSUMF ¶ 38.)  As of the date of plaintiff's deposition on August 20, 2020 – 22 months after his termination – he still had not been cleared to return to work.  (Id. ¶ 39.)

On October 15, 2018, plaintiff sent an email to the EEOC stating:

> Prior to me receiving this termination letter Mayor Philyaw contacted me advising me City Manager Jody Palmer was going to use this policy to terminate me.  She continues to advise that Brian Acree and I were set up. . . .Please advise if I need to file an additional charge.

(PSAMF ¶ 45, modified by Pl.'s Ex. 53 [109-51].)  Plaintiff testified that he sent this email to find out if he needed to file additional charges in addition to the Charge

he had already filed.   (PSAMF ¶ 46, modified by O'Neal Dep. 244:11-25.)
However, plaintiff never amended his original Charge or filed a new Charge to
assert the claims for failure to accommodate and/or for discrimination or retaliation
based on his termination. (DSUMF ¶ 40.) Plaintiff's EEOC Charge was not closed
until May 15, 2019, seven months after his termination.  (Id. ¶ 41.)  Plaintiff
received his right to sue letter on May 15, 2019. (PSAMF ¶ 47, modified by DR-
PSAMF ¶ 47.)

Plaintiff appealed his termination in a letter submitted through his attorney.
(PSAMF ¶ 50, modified by Pl.'s Ex. 57 [109-55].)  Through an attorney, Mr.
Palmer denied his appeal and stated that plaintiff's October 2017 grievance had
been administratively closed because the relevant individuals were no longer
employed by the City. (O'Neal Dep. Ex. 55 [90-57].)

During the years 2017 and 2018, the City did not have any federal contracts
or programs or activities within the Police Department or otherwise that received
federal financial assistance. (DSUMF ¶ 42.) Mr. Vande Zande was not consulted
in the decisions to terminate plaintiff's benefits and/or his employment. (Id. ¶ 43.)
Mr. Palmer was not aware of plaintiff's purported complaints to the Paulding
County District Attorney and Chief Investigator Jared Wall on June 12, 2018, a
complaint to the Georgia Board of Workers' Compensation, or a "HIPPA"

complaint at any time during plaintiff's employment with the City.  (Id. ¶ 44.[26])

Mr. Palmer held open plaintiff's position for the entire duration of his medical leave

and, had plaintiff been cleared to return to work, he would have returned to his

position.  (Id. ¶ 45.[27])

## III.   <u>SUMMARY JUDGMENT STANDARD</u>

A "court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  <u>See</u> Fed. R. Civ. P. 56(a).  The party moving for summary judgment

bears the initial burden of "informing the court of the basis for its motion and of

identifying those materials that demonstrate the absence of a genuine issue of

material fact."  <u>Rice-Lamar v. City of Fort Lauderdale</u>, 232 F.3d 836, 840 (11th

---

[26] Plaintiff denies the above proposed fact but does not cite any evidence in support of his denial.  (PR-DSUMF ¶ 44.)  Thus, the fact is deemed admitted.  <u>See</u> N.D. Ga. Civ. R. 56.1(B)(2)(a)(2).  Moreover, the April 28, 2018 email plaintiff refers to (without citation) does not refute the proposed fact.

[27] Plaintiff denies this proposed fact by citing his Declaration.  (O'Neal Decl. [109-5] ¶ 59 ("After I began leave, I believe that most of my duties were done by Sgt. Ivey.").)  However, declarations offered in support of summary judgment must be based on personal knowledge; anything less is insufficient.  Fed. R. Civ. P. 56(c)(4); <u>Pace</u>, 283 F.3d at 1278.  Plaintiff's testimony here is not based on personal knowledge and thus is disregarded.  <u>See</u> <u>Pace</u>, 283 F.3d at 1278-79 ("[A]n affidavit stating that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact.").

Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate. Rice-Lamar, 232 F.3d at 840. "In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." Id. (citing Anderson, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried. Anderson, 477 U.S. at 250. The applicable substantive law will identify those facts that are material. Id. at 248. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. Id. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. For factual issues to be "genuine," they must have a real basis in the record. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial." Id. at 587.

## IV.   DISCUSSION

### A.   ADEA and ADA Discrimination Claims

Plaintiff asserts claims against the City for age discrimination under the ADEA and for disability discrimination under the ADA and the Rehab Act. (Am. Compl. Counts II & IV.) Because these claims are based on circumstantial evidence, they are analyzed under the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), burden shifting framework. See Washington v. UPS, 567 F. App'x 749, 752-53 (11th Cir. 2014) (per curiam) (applying McDonnell Douglas to

claims under the ADA and ADEA). Plaintiff also "must prove that his age or disability was a 'but-for' cause of the adverse employment action—meaning it had a 'determinative influence on the outcome' of the [City's] decision." King v. HCA, 825 F. App'x 733, 736 (11th Cir. 2020) (per curiam) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009) (ADEA); McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077 (11th Cir. 1996) (ADA)).

"Presentation of a prima facie case by a plaintiff raises a rebuttable inference of discrimination and shifts the burden of proof to the employer to respond with a legitimate, nondiscriminatory reason for dismissing the plaintiff." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989). If the City puts forward a legitimate, nondiscriminatory reason for the adverse actions, "the burden returns to the plaintiff to prove by significantly probative evidence that the proffered reason is a pretext for discrimination." Id.

The City concedes that plaintiff can show a prima facie case for his age discrimination claim. However, it makes no such concession for his disability discrimination or failure to accommodate claims. For his disability discrimination claim, plaintiff must demonstrate that he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability. Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255-56 (11th Cir. 2007). "'[T]he term

31

'discriminate' includes . . . not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . .'" Id. at 1262 (quoting 42 U.S.C. § 12112(b)(5)(A)).  Discrimination claims under the Rehab Act are governed by the same standards used in ADA cases, see 29 U.S.C. § 794(d), and therefore the claims will be discussed together.  Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000).[28]

The City argues that plaintiff cannot satisfy elements (2) or (3).  (See Defs.' Br. [88-1] 14-16.)  Beginning with element (2), a "qualified individual" is one who, with or without reasonable accommodation, can perform the essential function of the job that he holds or desires.  42 U.S.C. § 12111(8).  Whether a certain job function is essential is "evaluated on a case-by-case basis by examining a number

_____

[28] In a footnote, the City argues that plaintiff's Rehab Act claims are barred due the City's nonreceipt of federal assistance.  (Defs.' Br. 13 n.16.)  In his Declaration, Mr. Palmer testified that the Police Department has not received federal funds.  (Palmer Decl. [88-4] ¶ 25.)  However, as plaintiff points out, this does not mean the City has not received funds, either directly or indirectly, which would make it subject to the Rehab Act.  See 45 C.F.R. § 84.3(f) (defining recipient under Rehab Act as "any state or its political subdivision . . . to which federal assistance is extended directly or through another recipient . . .").  Thus, the undersigned addresses plaintiff's Rehab Act claims on the merits.

of factors." <u>D'Angelo v. ConAgra Foods, Inc.</u>, 422 F.3d 1220, 1230 (11th Cir. 2005) (quotations omitted).  These factors can include, <u>inter alia</u>, the employer's judgment, written job descriptions prepared before advertising or interviewing applicants, or the amount of time on the job performing the function. 29 C.F.R. § 1630.2(n)(3).

The City does not identify any essential functions of plaintiff's job, nor which specific ones he is or was incapable of performing.  Plaintiff argues that the City's failure to identify the essential functions is fatal to their argument that he is not a qualified individual. <u>See</u> <u>Acevedo v. City of Phila.</u>, 680 F. Supp. 2d 716, 734 (E.D. Pa. 2010) (finding defendant had failed to show plaintiff was not a qualified individual where a genuine fact dispute as to what essential functions of police officer were where the city had multiple job descriptions).  However, the City argues that because plaintiff was incapable of performing <u>any</u> functions of his job, he obviously could not perform any essential functions.  The City points to plaintiff's testimony that from the time he began leave in early-October 2017 until the time of his deposition, his doctors had not cleared him to return to work. (O'Neal Dep. 202:21-204:12, 208:11-24.)  He also testified he was unsure when, if ever, he would be cleared to return to any type of work. (<u>Id.</u> at 219:9-220:8.)

Plaintiff responds that he is not a medical doctor and his opinion on his ability, or lack thereof, to work is irrelevant. (Pl.'s Br. 12.) As such, he argues that there is a fact issue as to whether he is a qualified individual. However, a plaintiff's testimony on his ability to perform his job is relevant. See Groover v. Fayette Cty., Ga., No. 3:17-CV-00200-TCB-AJB, 2018 WL 9490076, at *10 (N.D. Ga. July 27, 2018) (finding factual contradiction where plaintiff testified she could type limited amounts and where her physician opined she could not type at all); Santandreau v. Miami-Dade Cty., No. 10-24616-CIV-ALTONAGA/Simonton, 2011 WL 13136161, at *12 (S.D. Fla. Aug. 1, 2011) (finding an issue of fact as to whether plaintiff was a qualified individual under the ADA where plaintiff testified he was capable of working within his classification despite his ailments).

Plaintiff also responds that he performed some functions of his job while on leave. (Pl.'s Br. 11-12.) Here, plaintiff says that he completed investigatory work related to his workplace complaints for investigators, made job-related phone calls, gathered evidence from witnesses related to the SPI investigation, and filled out paperwork while on medical leave. (O'Neal Decl. ¶¶ 34-37.) Given this evidence, a jury could find that plaintiff is a qualified individual depending on how it weighs plaintiff's testimony that he could not work and his doctor's notes indicating he could not return to work against his performing some investigative and

34

administrative work . See Schultz v. Royal Caribbean Cruises, Ltd., 465 F. Supp. 3d 1232, 1271-72 (S.D. Fla. 2020) (finding an issue of material fact where employer did not identify any essential job functions but implied employee could not perform any and employee offered testimony and medical evidence that he could perform them). Because there is sufficient evidence to raise a genuine issue of material fact on whether plaintiff was qualified, plaintiff has met the second element of his prima facie claim.

The City contends that plaintiff cannot meet element (3) because he cannot show it failed to provide him a reasonable accommodation or discriminated against him because of his disability. (Defs.' Br. 15-18.) With regard to accommodation, plaintiff bears the burden of identifying a reasonable accommodation that would have enabled him to perform his job. Gilliard v. Ga. Dep't of Corr., 500 F. App'x 860, 868 (11th Cir. 2012) (per curiam). An accommodation is reasonable under the ADA "only if it enables the employee to perform the essential functions of the job." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1259-60 (11th Cir. 2001).

Again, neither the City nor plaintiff attempt to identify the "essential functions" of plaintiff's position. [29]   Plaintiff argues that it is the City's burden to identify what essential functions he cannot perform. (Pl.'s Br. 13.)   However, it is plaintiff's burden to identify a reasonable accommodation that would have enabled him to perform his job. Gilliard, 500 F. App'x at 868.   "Moreover, an employer's duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Frazier-White v. Gee, 818 F.3d 1249, 1255-56 (11th Cir. 2016) (internal quotations omitted).

Here, the only accommodation plaintiff ever requested was the use of leave. While courts generally have held that the use of leave is a reasonable accommodation, requiring an employer to provide indefinite leave until the employee's health problems are resolved is unreasonable. See Wood v. Green, 323 F.3d 1309, 1312-13 (11th Cir. 2003).   As evidenced by plaintiff's testimony, he was unsure when, if ever, he could return to work in the capacity he had been before his heart problems.   Moreover, plaintiff never proposed or requested for any other form of accommodation than more leave time.   (O'Neal Dep. 207:25-208:15.)

---

[29] As previously discussed, the City relies on plaintiff's testimony that he was unsure of whether he would ever be medically cleared to return to his previous job duties.

Thus, plaintiff's request for more leave after he had already taken a year's worth of leave was not a reasonable accommodation that would have allowed him to perform his job. See Wood, 323 F.3d at 1314 (accommodation must enable employee to perform job presently or in the immediate future). For these reasons, his failure to accommodate claim fails.

Finally, the City argues that plaintiff was not subjected to unlawful discrimination because of his disability. The City's stated reason for terminating plaintiff was that he was unable to work for over a year, had exhausted all available leave, had been absent longer than contemplated by the City's Handbook, and it was unknown if or when he would be able to return to work. (Defs.' Br. 17.) The City also claims that plaintiff's health benefits were terminated because he failed to pay his share of the premiums. (Id.)

In response, plaintiff claims that Mr. Palmer and Chief Vande Zande "conspired" to terminate him on the basis of his disability. As evidence of Mr. Palmer's discriminatory intent, plaintiff shows that Mr. Palmer and Chief Vande Zande planned to subject him to a fitness for duty exam before he could return to work. (Pl.'s Ex. 16 [109-15]; Pl.'s Ex. 48 [109-43]; Vande Zande Dep. [86] 94:24-95:5; 95:19-25.)

37

Case 4:19-cv-00177-TWT   Document 125   Filed 02/19/21   Page 38 of 75

Plaintiff has not raised a triable issue over whether the City discriminated against him on the basis of his disability. The City would have been within its rights under the ADA to have plaintiff submit to a fitness for duty exam as long as the exam "was job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4). Regardless, plaintiff admits he never had to submit to a fitness for duty exam, and the mere threat of subjecting plaintiff to a fitness for duty exam is insufficient. (O'Neal Dep. 204:18-205:10.) Plaintiff also fails to show that the City terminated his health benefits for any other reason than his failure to pay his share of the premiums.

Moreover, no evidence shows that Mr. Palmer, the relevant decisionmaker, ever made any blatantly discriminatory remarks. Plaintiff, citing an audio recording of a conversation he had with Mr. Palmer on September 30, 2017, misconstrues what Mr. Palmer actually said. The Court has reviewed the audio recording. In the recording, Mr. Palmer merely discussed plaintiff's concerns with Chief Vande Zande and generally how all employees could be healthier. He never made a reference to physical ability. (Pl.'s Ex. 8 [109-7].) Plaintiff has also

submitted no probative evidence indicating that Mr. Palmer sought to get rid of another disabled employee (Officer Ricky Walraven) via a fitness for duty exam.[30]

Because plaintiff cannot show that the City failed to accommodate him or discriminated against him on the basis of his disability, his ADA discrimination and Rehab Act claims fail.   Therefore, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** to the City as to Count IV.

Assuming, arguendo, that plaintiff could make a prima facie claim of ADA discrimination, and all parties agreeing he can make a prima facie ADEA claim, the burden of proof shifts to the City to offer a legitimate, nondiscriminatory reason for the adverse employment actions. Carter, 870 F.2d at 584.  Should an employer make such a showing, the employee must show that the employer's reason is false, and the real reason was discrimination.  Id.; Giraldo v. Miami Dade Coll., 739 F. App'x 572, 574 (11th Cir. 2018) (per curiam).

---

[30] Mr. O'Neal references Plaintiff's Exhibit 45 [109-43] to substantiate this claim.  Exhibit 45 is an email sent by plaintiff on April 29, 2018 wherein he alleges that Mr. Palmer stated that Officer Ricky Walraven is "a damn headache and he would create a fitness for duty policy so when he fails he can get rid of him." (Pl.'s Ex. 45, at 2.)  However, plaintiff provides no context as to when or under what circumstances Mr. Palmer said this.  Indeed, Mr. Palmer had previously told plaintiff that he would not subject Mr. Walraven to a fitness for duty exam even though he believed he could do so.  (See Pl.'s Ex. 8.)

The City argues that it terminated plaintiff because he was unable to return to work, exhausted all of his available leave, had been absent longer than contemplated by the City Handbook, and it was unknown when he would be able to return to work.  (Defs.' Br. 17-18.)   The City terminated plaintiff's health benefits because he had not been paying his share of the premiums after he had exhausted his PTO.  (Id.)   Thus, the City has satisfied its burden of offering legitimate, nondiscriminatory reasons for its actions.

Plaintiff argues these reasons are pretextual because the "City dealt with other disabled employees substantially differently in the past" and "supported those employees through their hospital stays, never required payment from them for benefits, and never took away benefits."  (Pl.'s Br. 15.[31])  He also argues that the City replaced several other older police officers with younger, cheaper hires.  (Id. at 15-16.)  As shown below, plaintiff has no probative evidence to support these arguments.

_____

[31] Plaintiff again relies on the "blatantly discriminatory" remarks made by Mr. Palmer and an alleged conspiracy between Mr. Palmer and Chief Vande Zande to terminate plaintiff by subjecting him to a fitness for duty exam.  (Pl.'s Br. 15-16.)   As previously discussed, Mr. Palmer's statements were not blatantly discriminatory, and the City would have been within its rights to subject plaintiff to a fitness for duty exam.

Plaintiff cites to Ms. Kendall's efforts to collect PTO donations for former City employee Ricky Walraven as evidence the City treated other disabled employees differently. (Pl.'s Br. 15; PSAMF ¶ 24.) In the email, Ms. Kendall asks City employees if they wish to donate PTO to Mr. Walraven, who was hospitalized. No such email was sent when plaintiff was hospitalized. However, Mr. Palmer (the decisionmaker) testified he played no role in encouraging or discouraging Ms. Kendall's actions on behalf of Mr. Walraven. (Palmer Dep. [85] 84:11-88:12.) Nor did Mr. Palmer prevent Ms. Kendall from beginning a similar effort on behalf of plaintiff. Finally, plaintiff does not demonstrate how Mr. Walraven's situation was similar to his own.

Plaintiff again argues Mr. Palmer told him that he was going to use the fitness for duty exam policy to get rid of a disabled employee (Mr. Walraven) and admitted he planned to use the fitness for duty policy to discriminate against disabled or older officers. (Pl.'s Br. 15, 17.) Plaintiff relies on the same email addressed earlier in support of his argument. (Pl.'s Ex. 45 [109-43].) As previously discussed, plaintiff provided no context as to where or when Mr. Palmer allegedly made these statements to him. Importantly, there is no evidence that Mr. Walraven was disabled, of Mr. Walraven's age, or that Mr. Palmer contemplated subjecting Mr. Walraven or did subject him to a fitness for duty exam.

41

Finally, plaintiff argues that the City "achieved the goal of placing younger officers in the positions formerly held by older and sometimes more expensive employees" by forcing out three officers—Larry Konieczny, Brian Acree, and Sgt. Wilson. Again, plaintiff fails to provide evidence of these officers' age or salary or any evidence that they were replaced by younger, less expensive employees. Critically, plaintiff cites to no evidence that Mr. Palmer was involved in "pushing out" these employees; plaintiff only cites to evidence that Chief Vande Zande was the relevant party involved. (O'Neal Decl. ¶ 5; Vande Zande Dep. 59:8-10.) Moreover, plaintiff relies on inadmissible hearsay in attempting to show the City's pretext.[32] See Wells v. Xpedx, No. 8:05-CV-2193-T-EAJ, 2007 WL 9723786, at *1 (M.D. Fla. Aug. 22, 2007) (independent investigators notes held to be hearsay).

Plaintiff has also failed to show the City's reasons for terminating his FSA and voluntary health benefits were pretextual. Plaintiff cites to evidence that shows Mr. Palmer was aware of his medical issues and financial difficulties but terminated

---

[32] Particularly, Mr. O'Neal cites to Plaintiff's Exhibit 61 [109-59], which is an excerpt of SPI's investigation report, in arguing younger officer received special treatment from the City. The excerpt is notes of an interview between the investigator and another employee—Mathew Winfrey. It reads: "[H]e stated it causes some bad feelings between the new recruits and the older officers because they are shown favoritism." (Pl.'s Ex. 61, at 2.) The excerpt does not provide any context on what it was that caused this alleged "bad feelings."

his health benefits in contradiction to the City Handbook and because he believed plaintiff would be unable to pay. (Pl.'s Br. 16.) Plaintiff argues that because his disability was the reason that he could not pay his FSA and voluntary health benefits, Mr. Palmer's decisions to terminate his benefits was discriminatory. However, plaintiff's arguments fail. As the City points out in Reply, Mr. Palmer's awareness[33] of plaintiff's financial difficulties and belief that plaintiff would be unable repay the City for the premiums until he returned to work are not probative of any discriminatory animus. (Defs.' Reply 5-6.) The City also argues that Mr. Palmer terminated plaintiff's FSA and voluntary health benefits based on the City Handbook. Plaintiff fails to disprove this argument. Moreover, even if Mr. Palmer was mistaken that plaintiff's nonpayment violated the City Handbook, his honest belief can still constitute a legitimate reason for the adverse decision. See Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) (holding that an employer's honest belief that an employee violated its policies can constitute a

---

[33] It is unclear if Mr. Palmer was aware of plaintiff's financial difficulties when he terminated plaintiff's health benefits. Plaintiff cites to a portion of Mr. Palmer's deposition testimony discussing a June 8, 2018 email plaintiff sent Mr. Palmer. (Palmer Dep. 187:11; O'Neal Dep. Ex. 46 [90-48].) In the email, plaintiff states he cannot afford to pay for medical records and that he is generally in financial distress. This email was sent several months after Mr. Palmer had terminated plaintiff's FSA and voluntary benefits.

legitimate reason for termination even if the employer's belief may have been mistaken or wrong). Ultimately, plaintiff has failed to show pretext.

For these reasons, plaintiff has failed to show the nondiscriminatory reasons articulated by the City for its actions are pretextual. Thus, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** to the City as to Counts II and IV.

### B.   ADA, ADEA, and Rehab Act Retaliation Claims

Plaintiff also asserts retaliation claims against the City under the ADA, ADEA, and Rehab Act. (Am. Compl. Counts III & V.) Like his discrimination claims, these claims are analyzed under the McDonnell Douglas burden shifting framework. See Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) (ADEA and ADA). To establish a prima facie case, plaintiff must show: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected conduct. Id. at 1311.

Once a plaintiff establishes a prima facie case of retaliation, the employer must articulate a legitimate, nondiscriminatory reason for the challenged action. Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001). If an employer articulates one or more reasons, the presumption of discrimination is eliminated,

44

and the plaintiff has the opportunity to present evidence that the offered reason is pretextual.  See id. at 1243.

Plaintiff alleges that the City engaged in three distinct retaliatory acts:  (1) threatening to subject him to a fitness for duty exam; (2) terminating his health benefits; and (3) ultimately terminating his employment.  (Am. Compl. ¶¶ 53, 64, 92, 109, 126, 135.)  The City asserts that he cannot either meet a prima facie case or establish pretext for each act.

With regard to the fitness for duty exam, the City argues that plaintiff cannot establish a retaliation claim because he did not suffer an adverse employment action.  An adverse employment action is "conduct that alters an employee's compensation, terms, conditions, or privileges of employment," typically termination, suspension, or demotion.  Bass v. Bd. of Cty. Cmm'rs, Orange Cty., Fla., 256 F.3d 1095, 1118 (11th Cir. 2001), overruled in part on other grounds by Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008).

The City argues that because plaintiff was never subjected to a fitness for duty exam, he never suffered an adverse employment action.  (Defs.' Br. 20.)  Plaintiff does not dispute this, and it stands to reason that plaintiff cannot state a claim based on an adverse employment action that never occurred.  See Hargray v. City of Hallandale, 57 F. 3d 1560, 1568 (11th Cir. 1995) (employees who

voluntarily resign do not suffer an adverse employment action).   Thus, plaintiff cannot establish a retaliation claim based on the threat of being subjected to a fitness for duty exam.

Next, the City asserts that the termination of plaintiff's FSA and voluntary benefits in February and March 2018[34] cannot be the basis of a retaliation claim. (Defs.' Br. 20-21.)   As an initial matter, plaintiff does not respond to the City's arguments regarding his ADEA or Rehab Act retaliation claims related to the termination of his benefits.   Because the City's arguments also are supported, plaintiff's claims fail.   See Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) (where party fails to respond to an argument, the court deems such claim abandoned).

Thus, only plaintiff's ADA retaliation claim remains.   The City argues that plaintiff has not shown a causal nexus between the termination of his benefits and any protected activity.   The City points out that at the time plaintiff's benefits were terminated, his grievances all concerned Chief Vande Zande; and none of them expressed opposition to, alleged, or suggested an employment practice made

---

[34] Plaintiff's health and dental benefits were not taken away until he was terminated from employment in October 2018.

46

unlawful under the ADA, ADEA, or Rehab Act.  However, plaintiff points to an email he sent to Mr. Palmer on January 31, 2018, requesting additional time off per his doctor's order.[35]  Plaintiff argues that this protected activity (requesting leave as an accommodation) is close in temporal proximity to the termination of his FSA benefits (which occurred seven days later) so that it is sufficient to state a prima facie case of ADA retaliation.

Assuming that plaintiff is correct, the undisputed facts show that his FSA benefits were terminated for a legitimate, nondiscriminatory reason and plaintiff cannot show it was pretextual.  Here, the City terminated his FSA benefits because they were employee-funded, and plaintiff had not been making the payments. Because plaintiff does not dispute these facts, he cannot show that "but-for" his leave request his benefits were terminated.  Furthermore, Mr. Palmer allowed plaintiff to remain on leave for another eight months.  This is not what a manager

---

[35] In Reply, the City contends that plaintiff's argument should be rejected because he is making it for the first time in response to its summary judgment motion.  Plaintiff's retaliation claims appear to be premised on his grievances, not this January email. (Am. Compl. ¶¶ 56, 64, 107, 125-126.) Plaintiff also concedes that his retaliation claims are not based on his early grievances against Chief Vande Zande.  (Pl.'s Br. 22.)  Thus, plaintiff's retaliation claim based on the termination of his benefits could be rejected for this reason.  See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).

harboring retaliatory animus would do.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 743-45 (11th Cir. 1996) (noting that supervisor's agreement with employee's alleged protected activity showed no retaliatory animus).

Plaintiff also argues that Mr. Palmer retaliated against him by requesting updated information from his doctors, imposing deadlines to submit the information, and making "pervasive requests"[36] for the medical information. (Pl.'s Br. 22-28.)  On April 10, 2018, plaintiff filed his Charge with the EEOC.  In his Charge, he alleged retaliation by Chief Vande Zande due to his disability and that the Chief had created a hostile work environment.  Mr. Palmer was aware that plaintiff had filed this Charge.  (Pl.'s Ex. 23 [109-22], at 2 (April 30, 2018 email from plaintiff to Mr. Palmer and others referencing EEOC Charge).)  Eight days after Mr. Palmer was aware of the Charge, he sent plaintiff an email telling him to have forms filled out by his doctors and specialists. (Ex. 46 [109-44], at 3-4.)  Mr. Palmer gave him seven days to return the forms.  (Id.)  Plaintiff repeatedly sought extensions from Mr. Palmer, which were all granted.

---

[36] Again, plaintiff seems to advance this argument for the first time in response to defendants' Motion.  Thus, this argument could be rejected for the same reasons stated supra note 35.

Mr. Palmer's requests for medical information are not an adverse employment action and are not retaliatory.  As previously discussed, the ADA permits employers to make job-related medical inquiries that are consistent with business necessity.  See 42 U.S.C. § 12112(d)(4).  That was the purpose of Mr. Palmer's requests.  Mr. Palmer was seeking information from plaintiff and his doctors to determine when he could return to work, with or without accommodation. (O'Neal Dep. 184:16-204:15.)  While the paperwork may have been difficult to obtain, Mr. Palmer repeatedly accommodated plaintiff's requests for more time.

However, even if these requests were not permitted under the ADA, they do not constitute an adverse employment action.  Plaintiff argues that these requests are a type of action that occurred that sufficiently qualifies as an adverse employment action under the circumstances.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1181 (11th Cir. 2003).  In the employment context, an employee can demonstrate an adverse action when the employee shows a material change in the terms, conditions, or privileges of employment as viewed by a reasonable person in the circumstances.  Id. at 1181-82.  "As a general rule, an ADA plaintiff must demonstrate that a reasonable person in his position would view the action in question as adverse."  Id. at 1181.  Thus, there is a subjective and objective component that must be analyzed on a case-by-case basis.  Id.

49

Here, plaintiff has not shown that a reasonable person would consider the requests for medical information as a material change in the terms, conditions, or privileges of employment. When an employee has been hospitalized and is unable to work, it is reasonable to expect that the employer would seek to determine when he or she can return to work and under what conditions. While Mr. Palmer's deadlines to return the forms may have been difficult for plaintiff to meet, he repeatedly extended them to give plaintiff more time to comply and have his doctors complete the necessary forms. Therefore, a reasonable person would not consider Mr. Palmer's requests a material change in the terms, conditions, or privileges of employment and plaintiff's claim fails.

Finally, plaintiff argues that he was terminated in retaliation for his participation in protected activity. As previously discussed, plaintiff submitted numerous internal complaints against Chief Vande Zande in September/early-October 2017 and February 2018. He then filed his EEOC Charge in early-April 2018, followed by several additional complaints against Chief Vande Zande in late-April 2018 and early-June 2018. Plaintiff was ultimately terminated in October 2018. The undisputed facts show that Mr. Palmer, the relevant decisionmaker, was only aware of the internal complaints and the EEOC Charge. Therefore, these are the only activities that can support plaintiff's retaliation claims. See Martin v. Fin.

Asset Mgmt. Sys., 959 F.3d 1048, 1053 (11th Cir. 2020) (decisionmaker must be aware of employee's protected expression for a retaliation claim).

The City contends that plaintiff cannot show a causal connection between his complaints and his termination, and also cannot show that its legitimate nondiscriminatory reason is pretextual.  (Defs.' Br. 22-23.)  "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam).  "A three to four-month disparity between the statutorily protected expression and the adverse employment action is not enough."  Id.  "Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."  Id.; see also Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).

Despite the passage of over four months between his protected activity and termination, plaintiff argues that there is nonetheless evidence to show causation. Plaintiff argues that Mr. Palmer waited to terminate him until October when he felt he had "cover" because plaintiff had been on medical leave for over a year. Plaintiff implies that it is possible Mr. Palmer harbored retaliatory animus toward plaintiff for over a year of because of his internal complaints, allegations, and an

51

EEOC investigation.  (Pl.'s Br. 28-30.)   In addition, plaintiff argues that the retirement of Mayor Philyaw, whom he testified would not allow him to be fired, made Mr. Palmer believe his decision to terminate plaintiff would not be challenged. (Id.)

While the passage of time is not always fatal to a plaintiff's ability to show causation, a plaintiff must show that there is other evidence tending to show causation.  See Thomas, 506 F.3d at 1364.  Plaintiff has failed to do so.  It is undisputed that Mayor Philyaw announced she would not seek reelection in August 2019—nearly a year after plaintiff's termination.  (O'Neal Decl. ¶ 52.)  Absent evidence Mr. Palmer knew of this decision at the time he decided to terminate plaintiff in October 2018, it is impossible for Mayor Philyaw's decision to retire to have had any effect on Mr. Palmer's decision to terminate plaintiff.  Moreover, Mr. Palmer's decision to terminate plaintiff after he had been on medical leave for a year was consistent with the City Handbook.  (Palmer Dep. Ex. 78 [115-20], at 41.) Regardless of the issue of causality, for reasons stated supra Part IV.A, plaintiff has not shown that the City's reason for terminating him—his year-long absence with no indication of when he could return—was pretextual.  Thus, plaintiff's retaliation claims under the ADA, ADEA, and Rehab Act fail.   For these reasons, the

undersigned **RECOMMENDS** that summary judgment be **GRANTED** to the City as to Counts III and V.

**C.    Plaintiff's Failure to Exhaust Administrative Remedies for ADA/ADEA Retaliation Claims**

Plaintiff's Rehab Act, ADA, and ADEA retaliation claims fail for an additional reason.  Before asserting a particular claim in a lawsuit under the ADA or ADEA, a plaintiff must exhaust his administrative remedies by presenting that claim in a charge with the EEOC.  See Anderson v. Embarq/Sprint, 379 F. App'x 924, 926 (11th Cir. 2010) (per curiam); Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004) (per curiam).  Charges filed without the assistance of counsel will be construed liberally.  Gregory, 355 F.3d at 1280.  "The purpose of this exhaustion requirement 'is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.'"  Id. at 1279 (quoting Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 929 (11th Cir. 1983)).  In the Eleventh Circuit, "allegations in a judicial complaint filed pursuant to Title VII may encompass any kind of discrimination like or related to the allegations contained in the charge."  Id. at 1279.

When the filing of an EEOC charge leads to retaliation, a plaintiff ordinarily need not file a second EEOC charge to pursue a retaliation claim.  See Baker v.

Buckeye Cellulose Corp., 856 F.2d 167, 168-69 (11th Cir. 1988) (stating that because "a claim of retaliation could reasonably be expected to grow out of the original charge of discrimination," a plaintiff need not file a new EEOC charge alleging retaliatory actions when she had already filed lawsuit); but see Duble v. FedEx Ground Package Sys., 572 F. App'x 889 (per curiam) (11th Cir. 2014) (limiting the holding of Baker to only those cases in which the plaintiff filed an EEOC charge, then filed a lawsuit, and experienced the retaliatory actions while the lawsuit was pending).

Here, plaintiff filed an EEOC Charge on April 10, 2018—without the assistance of counsel—alleging that after he complained to Mr. Palmer on September 30, 2017, Chief Vande Zande retaliated and discriminated against him due to his disability by threatening to require him to take a fitness for duty exam when he returned from medical leave.  (Pl.'s Ex. 49 [109-47].)  Plaintiff was terminated six months after filing his EEOC Charge—on October 9, 2018—but his EEOC Charge remained pending until May 15, 2019 (seven months after his termination). (Defs.' Mot. Ex. 1 [88-3], at 11, 16.) Plaintiff filed the instant lawsuit on August 13, 2019.

The City argues that because plaintiff's EEOC Charge makes no mention of his termination or an alleged failure to accommodate (because the actions had not

54

yet occurred) and plaintiff never amended his Charge or filed a new Charge before commencing this lawsuit, his claims based on these events are barred by his failure to exhaust administrative remedies. (Defs.' Br. 1-12.)  Plaintiff responds that his retaliation claim amplifies and grows out of the retaliation claims alleged in his EEOC Charge.  (Pl.'s Br. 1-10.)

The City relies on Duble to show that plaintiff failed to exhaust his administrative remedies.   Plaintiff is correct that unpublished opinions such as Duble are not binding precedent but persuasive authority.  See 11th Cir. R. 36-2; EEOC v. W. Customer Mgmt. Grp., LLC, 899 F. Supp. 2d 1241, 1255 n.14 (N.D. Fla. 2012).  Moreover, the Eleventh Circuit has said courts should be reluctant "to allow procedural technicalities to bar claims brought under [Title VII]."  Gregory, 355 F.3d at 1280.  However, this reluctance has limits where plaintiffs clearly had time to amend a Charge yet failed to do so.

In Duble, the court distinguished both Baker and Gupta v. East Texas State University, 654 F.2d 411 (5th Cir. 1981), as follows:

> In Gupta, we determined the plaintiff could proceed on retaliation claims growing out of EEOC charges that already were before the district judge.  See Gupta, 654 F.2d at 414 ("[T]he district court has ancillary jurisdiction to hear a claims when it grows out of an administrative charge that is properly before the court.").  In Baker, we did not state whether the administrative charge already had to be before the district judge, but noted the "complaint had been pending

for four months in the district court," when the plaintiff filed a motion for preliminary injunction.  <u>Baker</u>, 856 F.2d at 168-69.

<u>Duble</u>, 752 F. App'x at 893.

In contrast to the claims in those two cases, Mr. Duble's termination claims related to a discrete act of alleged discrimination that occurred after he filed his initial charge pertaining to FedEx's purported failure to accommodate.  <u>Duble</u>, 572 F. App'x at 893 (citing <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes separate actionable 'unlawful employment practice.'")).  According to <u>Duble</u>,

> Because this case is factually distinguishable from <u>Gupta</u> and <u>Baker</u>, we conclude the <u>Gupta</u> rule does not apply.  Duble's EEOC claim was still pending, when he was terminated, ostensibly for violating FedEx's email policy, and he had the opportunity to amend his EEOC charge or file a new charge relating to his termination.  Duble, however, chose not to amend or file a new charge.  Therefore, Duble failed to exhaust his administrative remedies regarding his termination claims.

<u>Duble</u>, 572 F. App'x at 893.[37]  The same holds true for plaintiff's lawsuit here.  His EEOC Charge was still pending when he was terminated, and he had the

---

[37] The Eleventh Circuit noted that FedEx terminated Mr. Duble in November 2009, and that he did not file suit until September 2011.  <u>Duble</u>, 572 F. App'x at 893.  In other words, he had plenty of time to amend or supplement the initial EEOC

56

opportunity to amend his Charge or file a new Charge relating to his termination. Plaintiff, however, chose not to do either regarding these subsequent discrete acts.

Plaintiff cites Bakersville v. Secretary of Department of Veteran Affairs, 377 F. Supp. 3d 1331 (N.D. Fla. 2019), as a case where the court found Duble inapposite and allowed retaliation claims related to the plaintiff's termination to proceed despite his failure to amend or file a new charge. While Bakersville was dismissive of Duble, it is factually distinguishable from the instant case. The plaintiff in Bakersville did amend his Charge on two occasions—one that alleged retaliatory hostile work environment and one that specifically mentioned his possible termination. Id. at 1336. The amendment that mentioned the possibility of termination was made the same month plaintiff was in fact terminated. Id. at 1333, 1336. Thus, the plaintiff in Bakersville was proactive in amending his complaint as discrete employment actions were taken. Moreover, the termination

---

charge to include the discrete acts of retaliation and discrimination which he claims led to this discharge. See Robinson v. Koch Foods of Ala., No. 2:13-CV-557-WKW, 2014 WL 4472611, at *2 (M.D. Ala. Sept. 11, 2014) ("[T]he court in Duble held that Baker and Gupta do not apply where retaliatory action occurs after the filing of the first EEOC charge but long enough before the filing of the lawsuit to give the plaintiff an opportunity to amend or to file a new EEOC charge to add a retaliation claim.").

retaliation claims could have reasonably "grown out of" his amendments mentioning his potential termination. See Baker, 856 F.2d at 168-69.

Therefore, like Mr. Duble, plaintiff failed to exhaust his administrative remedies regarding his termination claims. Duble, 572 F. App'x at 893; see also Buzzi v. Gomez, 62 F. Supp. 2d 1344, 1352 (S.D. Fla. 1999) ("Discrete acts of discrimination that occur subsequent to filing of an administrative charge are not reasonably related to the charged conduct.").   Accordingly, discrimination and retaliation claims related to plaintiff's discharge cannot be pursued here. Buzzi, 62 F. Supp. 2d at 1352 ("To permit [a plaintiff] to seek judicial relief without first filing a Charge with the EEOC would undermine the statutory procedures crucial to Title VII's conciliatory and remedial scheme.").

Because plaintiff failed to exhaust administrative remedies before bringing his ADA and ADEA retaliation claims, the undersigned **RECOMMENDS** in the alternative that summary judgment be **GRANTED** to the City as to Counts III and V.

### D.    FMLA Interference

Plaintiff alleges that the City interfered with his FMLA leave by requiring him to work while on FMLA leave and by terminating him while he was on FMLA. (Am. Compl. ¶ 92.)   He also alleges the City violated his rights under the FMLA

58

by "terminating his health benefits and flex medical spending while he was on FMLA." (Id.)  To state a FMLA interference claim, a plaintiff must show:  (1) he was entitled to a benefit under the FMLA and (2) he was denied that benefit.  See Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001); Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010).

Under the first prong, an employee is entitled to FMLA leave only if she suffers from a "serious health condition that makes her unable to perform the functions of her position." White v. Beltram Edge Tool Supply, 789 F.3d 1188, 1191 (11th Cir. 2015).  The parties do not dispute that plaintiff can satisfy this prong.

Under the second prong, requiring an employee to perform work during FMLA leave violates the FMLA. Simmons v. Indian Rivers Mental Health Ctr., 652 F. App'x 809, 818 (11th Cir. 2016) (per curiam) (requiring an employee to perform work while on FMLA leave constitutes an actionable interference with employee's FMLA rights).  Termination can also constitute FMLA interference. Spakes v. Broward Cty. Sheriff's Office, 631 F.3d 1307, 1309-10 (11th Cir. 2011) (plaintiff terminated upon requesting FMLA leave, thereby preventing her from taking such leave); see Strickland, 239 F.3d at 1208 (plaintiff terminated promptly

59

after leaving the worksite while, under his version of the facts, entitled to FMLA leave).  A plaintiff is not required to prove a causal connection between her request and her termination because the employer's motives are irrelevant.  <u>Spakes</u>, 631 F.3d at 1310.  Rather, the employer must prove, as an affirmative defense, "that it would have discharged [the plaintiff] for a reason wholly unrelated to the FMLA leave."  <u>Id.</u>

To the extent plaintiff claims his termination or loss of health benefits interfered with his FMLA rights, his claim fails.  Plaintiff was terminated on October 9, 2018, over a year after his FMLA leave began.[38] Plaintiff's FSA and voluntary health benefits were terminated in February and March of 2018.  The FMLA contemplates only twelve workweeks of leave within any twelve-month period.  29 U.S.C. § 2612(a)(1)(D).  A termination that occurs after the expiration of an employee's FMLA leave cannot interfere with his FMLA rights.  <u>See Johnson v. Morehouse Coll., Inc.</u>, 199 F. Supp. 2d 1345, 1358 (N.D. Ga. 2002) (plaintiff

---

[38] The parties disagree on when plaintiff's FMLA leave commenced. Viewing the facts in the light most favorable to plaintiff, his leave commenced October 4, 2017.  Based on this date, his FMLA leave would have expired on December 27, 2017.  Because plaintiff's termination and his termination of health benefits all occurred after the latest day his FMLA leave expired, these actions cannot constitute FMLA interference.

had no basis to claim defendant violated FMLA by terminating her for leave in excess of the twelve-week period allowed by FMLA). Thus, plaintiff's termination and loss of his FSA and voluntary health benefits cannot constitute FMLA interference. Indeed, plaintiff does not advance an argument as to how his termination interfered with his FMLA rights. Thus, the undersigned will address whether the City interfered with plaintiff's FMLA rights by requiring him to work.

"The FMLA does not provide clear guidance as to how much of an interference with FMLA leave is actionable." Salem v. City of Port St. Lucie, No. 2:17-CV-14431-ROSENBERG/MAYNARD, 2018 WL 5631305, at *6 (S.D. Fla. Oct. 31, 2018), aff'd, 788 F. App'x 692 (11th Cir. 2019) (per curiam) (citing Antekeier v. Lab. Corp. Am., 295 F. Supp. 3d 679, 684 (E.D. Va. 2018)). However, "the FMLA does not create an absolute right to be left alone." Simmons, 652 F. App'x at 819. The Eleventh Circuit has recognized that "occasional and brief telephone calls of a limited nature" cannot establish FMLA interference. Id. While the Eleventh Circuit has not addressed the question of voluntary work while on FMLA leave, the Eighth Circuit has held that there is no FMLA interference when working while on FMLA leave is voluntary and not a condition of employment. Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc., 826 F.3d 1149, 1159-60 (8th Cir. 2016). Moreover, even meeting with a supervisor while on FMLA leave,

61

absent other evidence, is insufficient to support an interference claim where the meeting is unrelated to work, did not require the employee to perform any job duties, and amounted only to a conversation. See Salem, 2018 WL 5631305, at *6.

The City argues that it did not require plaintiff to work during his FMLA leave. It asserts that none of its employees required plaintiff to work or asked him to perform his actual job duties. (Defs.' Br. 24.) The City also asserts that the fact that any work-related actions taken by plaintiff during his FMLA leave were voluntary and for his own benefit precludes a finding of interference. (Id. at 24-29.)

Plaintiff argues that he performed job duties while on FMLA leave. Among them were: (1) participating in and "keeping up" with the outside investigation commissioned by the City into Chief Vande Zande; (2) following up on tasks for the Police Department; (3) taking online classes to maintain his law enforcement certification; and (4) being required to check and respond to emails from the City. (Pl.'s Br. 33-35.)

Plaintiff primarily points to his involvement in the SPI investigation that, in part, was commissioned by the City due to his complaints about Chief Vande Zande. A SPI investigator contacted plaintiff by phone while he was on FMLA leave to request a meeting, and plaintiff met with him for "maybe a couple of hours" at his

62

home. (O'Neal Dep. 114:13-115:15.)  Plaintiff never told the investigator that he was on FMLA leave or that he could not meet with him.  (Id. at 117:13-19.) Moreover, no one ever directed plaintiff to meet with the investigator.  (Id. at 116:18-22.)

Plaintiff cites Michelucci v. County of Napa, No. 18-CV-05144-HSG, 2019 WL 1995332, at *6 (N.D. Cal. May 6, 2019), in support of his argument that participating in the investigation may constitute FMLA interference. In Michelucci, the employer began an investigation into the employee's complaints nearly a year after he first made them and only after he took protected leave. Id.  The employee alleged[39] that the employer "demanded that he attend an interview and cooperate with their investigation—and then accused him of failing to cooperate when he responded he was on leave." Id.  The court determined that these allegations were sufficient to state a FMLA interference claims because "they go far beyond requiring periodic reporting or other de minimis, work-related contacts, and could support a finding that Napa County used the investigation to discourage Michelucci from taking FMLA leave." Id.

_____

[39] Michelucci involved a motion to dismiss, where plaintiff's allegations are presumed to be true and all facts are construed in a light most favorable to the plaintiff.

63

Here, the City did not request plaintiff participate in the investigation. Plaintiff also concedes that his reports to SPI investigators were not within the normal scope of his duties (Pl.'s Br. 37), and all of his additional communications with the SPI investigators were voluntary (see e.g., O'Neal Dep. 119:1-126:3, 151:25-157:21). Plaintiff has thus failed to show how his voluntary participation in an outside investigation constituted interference with his rights under the FMLA. See Adams v. Anne Arundel Cty. Pub. Schs., 789 F.3d 422, 428 (4th Cir. 2015) (employee's participation in pre-disciplinary conference "did not constitute impermissible interference with [his] FMLA leave."); Krause v. Eihab Human Servs., Inc., No. 10 CV 898(RJD)(SMG), 2015 WL 4645210, at *14 (E.D.N.Y. Aug. 4, 2015) (email requesting employee participate in investigation was not interference).

Plaintiff also bases his interference claim on the fact that he performed regular job duties, such as keeping up with City emails, following up on Police Department tasks, and taking online training courses to maintain his law enforcement license while on FMLA. Plaintiff argues that he was required to participate in these activities, and these are sufficient to constitute FMLA interference. (Pl.'s Br. 35-36.)

64

Plaintiff testified he spent a total of about 35 minutes following up on tasks for the Police Department while on FMLA leave. (O'Neal Dep. 144:3-25, 149:25-151:7.) Plaintiff also asserts that he was required to work when he met with Mr. Palmer and Ms. Kendall on October 11, 2017 to discuss his grievances against Chief Vande Zande. (DSUMF ¶ 15.) Plaintiff also took two free one-hour online classes to maintain his law enforcement certification. (O'Neal Dep. 137:18-23.) In total, plaintiff estimates he spent around four hours on these activities while on FMLA leave.[40]

Here, plaintiff's phone calls were brief and occasional and were a de minimis intrusion on his FMLA leave. See Simmons, 652 F. App'x at 819. The undisputed facts show that plaintiff only took two phone calls that lasted a total of 35 minutes while on FMLA leave. Neither required him to do more than pass along institutional knowledge or contact another person by phone. Thus, these calls did not rise to the level of interference.

_____

[40] Plaintiff also argues that Mr. Palmer required him to work when he sent plaintiff an email telling him to keep up with his City emails. (Pl.'s Br. 35.) However, Mr. Palmer sent the email in question on December 28, 2017—after plaintiff's FMLA leave had ended. (O'Neal Dep. Ex. 20 [90-20], at 4.) Thus, this email is immaterial to plaintiff's FMLA interference claim.

Plaintiff's October 11, 2017 meeting also did not interfere with his FMLA rights.  In <u>Salem</u>, the employee, a police officer, was required to attend a meeting with the police chief.  <u>Salem</u>, 2018 WL 5631305, at *3.  The employee was terminated at the meeting.  <u>Id.</u>  The court found that requiring the employee to attend the meeting was not FMLA interference because the meeting was unrelated to work, did not require the employee to perform police officer duties, and amounted to only a conversation.  <u>Id.</u> at *6.  Like the meeting in <u>Salem</u>, plaintiff's October 11, 2017 meeting with Mr. Palmer was to discuss plaintiff's concerns with Chief Vande Zande and his work environment.  Plaintiff was not required to perform any police officer duties at this meeting.   In addition, plaintiff had previously requested to meet with Mr. Palmer at a water tower while on FMLA leave.  (<u>See</u> O'Neal Dep. Ex. 10 [90-10].)  Regardless, this single one-hour meeting did not interfere with plaintiff's FMLA rights.  <u>See Salem</u>, 2018 5631305, at *3; <u>Fraternal Order of Police, Lodge 1 v. City of Camden</u>, 842 F.3d 231 (3d Cir. 2016) (city did not interfere with police officer's rights under FMLA when city officials visited him at home while he was on leave).

Plaintiff also asserts that his online training constitutes FMLA interference. The City points out the training was for his benefit and shows that he could not

66

have worked as a law enforcement officer without the trainings.  (Defs.' Br. 29; Defs.' Reply 14.)

The City relies on Mitchell v. Pilgrim's Pride Corp., 817 F. App'x 701, 712 (11th Cir. 2020) (per curiam).  In Mitchell, the Eleventh Circuit held a plaintiff could not establish a FMLA interference claim where he had not been prejudiced by the alleged interference.  Id.  Essentially, the City argues that because plaintiff suffered no remediable harm by taking the trainings, there was no interference with his FMLA rights.  See Evans v. Books-A-Million, 762 F.3d 1288, 1296 (plaintiff must suffer remediable harm either through damages or equitable relief to show prejudice by a FMLA violation).  While plaintiff is correct that the facts here are dissimilar from Mitchell, his voluntary participation in the online training was not prejudicial to his FMLA rights.  Rather, his participation was arguably necessary for him to exercise his FMLA rights because plaintiff could not be reinstated if he was not certified to serve as a law enforcement officer.  See 29 C.F.R. § 825.216 (reinstatement); see also O.C.G.A. § 35-8-21(d) ("Any peace officer who does not fulfill the training requirements of this Code section shall lose the power to arrest.").

Finally, plaintiff urges that these actions should all be considered cumulatively rather than in isolation.  Even considering these actions in their total, the undersigned arrives at the same conclusion.  Overall, plaintiff shows that he

only "worked" about four total hours out of his twelve weeks of FMLA leave. While there is no specific quantity of hours that is necessary to show FMLA interference, given that plaintiff voluntarily participated in the investigation, was not prejudiced by his trainings, and was only briefly and occasionally interrupted by work-related calls, the sum of the evidence does not show that plaintiff was denied his substantive right to FMLA leave.  For these reasons, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** to the City as to Count I.

### E.    Free Speech Claim

Plaintiff asserts a § 1983 claim against City Manager Palmer for alleged violation of his First Amendment rights.  (Am. Compl. Count VII.)  As an initial matter, plaintiff fails to respond to Mr. Palmer's argument that he is entitled to qualified immunity.  This is perhaps because the argument is meritorious.  Under the doctrine of qualified immunity, government officials performing discretionary functions cannot be held individually liable for damages unless their conduct violates "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lassiter v. Ala. A&M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting Harlow v Fitzgerald, 457 U.S. 800 (1982)).

Here, Mr. Palmer is a government official (City Manager) performing a discretionary function. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004) (discretionary function is any act that falls within employee's job responsibilities). Moreover, there is no evidence that Mr. Palmer violated plaintiff's clearly established constitutional rights. See Gaines v. Wardynski, 871 F.3d 1203, 1210 (11th Cir. 2017) (qualified immunity especially appropriate in First Amendment cases because defendant will rarely be on notice his actions are unlawful). Thus, the undersigned could recommend summary judgment on plaintiff's free speech claim for this reason alone. See N.D. Ga. Civ. R. 7.1(B) ("Failure to file a response shall indicate that there is no opposition. . ."). However, in the interest of a full Report and Recommendation, the undersigned will consider plaintiff's free speech claim.

Count VII alleges that Mr. Palmer "unconstitutionally violated [plaintiff's] First Amendment rights by terminating him for reporting defendants' conduct to the City Council, the District Attorney, and HIPPA [sic]." (Am. Compl. Count VII ¶ 140.)  Where a public employee, such as plaintiff, alleges wrongful termination because of the exercise of free speech, he must show by a preponderance of the evidence that:  (1) the speech was on a matter of public concern; (2) his interest in engaging in the speech outweighs the City's interest in prohibiting, limiting or

regulating speech; and (3) his speech played a "substantial part" in the decision to terminate his employment. See Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1288 (11th Cir. 2000). If the employee meets his burden, then the employer must prove by a preponderance of the evidence that "it would have reached the same decision . . . even in the absence of the protected conduct." Bryson v. City of Waycross, 888 F.2d 1652, 1656-66 (11th Cir. 1989).

With regard to the first prong, to determine "[w]hether an employee's speech addresses a matter of public concern," the Court must examine "the content, form, and context" of the speech, "as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). The Supreme Court has explained that the purpose of this requirement is to prevent the federal courts from becoming "a roundtable for employee complaints over internal office affairs." Id. at 149.

Here, the content, form, and context of plaintiff's speech strongly support the conclusion that he was not speaking as a citizen addressing a matter of public concern. Plaintiff's speech was made via emails sent to Mr. Palmer, the Mayor of Hiram, City Council members, and other superiors. He contends his speech was on a matter of public concern because he was reporting "illegal and/or fraudulent activities of Mr. Palmer, Chief Vande Zande, and Mr. Moran to the outside investigators hired by the City Council, the EEOC, and the district attorney." (Pl.'s.

70

Br. 38.)   However, plaintiff's complaints were primarily concerned with his personal grievances and workplace concerns with Chief Vande Zande.  His emails to Mr. Palmer on April 28, 29, and 30, 2018, copied to the Mayor and City Council, questioned the status of his February 27, 2018 grievance, discussed his employment status, and requested "an official investigation" concerning the fitness for duty policy and its application to him, as well as the alleged falsification of a workers' compensation report involving another City employee.  (See O'Neal Dep. Ex. 62 [90-64], at 9-11, 17-27.)  In a June 8, 2018 email to Mr. Palmer, plaintiff again complained that his grievances were being ignored, brought up concerns regarding the fitness for duty policy, and took issue with Mr. Palmer's request for information from plaintiff's medical providers.  (Id. at 36-38.)

Plaintiff cites Lane v. Franks, 573 U.S. 228 (2014) in support of his assertion that his speech is on a matter of public concern.  However, this case is meaningfully distinguishable from Lane.  In Lane, the plaintiff, compelled by a subpoena, testified to a grand jury about matters he had learned while working at a public university.  Id. at 238-39.  The Court determined his speech was on a matter of public concern because it concerned corruption in a public program and a misuse of state funds.  Id. at 241.

71

Here, the primary focus of plaintiff's speech concerned his private grievances related to Chief Vande Zande and Mr. Palmer's treatment of him and the status of investigations related to workplace grievances. While plaintiff's speech did concern what he believed to be a hostile work environment and discrimination by the City against its employees, plaintiff cannot convert his personal grievances to a matter of public concern based on "a supposed popular interest in the way public institutions are run.'" Ferrara v. Mills, 781 F.2d 1508, 1516 (11th Cir. 1986). Therefore, plaintiff's speech primarily concerned private grievances about his working conditions rather than matters of public concern. See Boyce v. Andrew, 510 F.3d 1333, 1344 (11th Cir. 2007); Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) (plaintiff's speech was not on matter of public concern where speech was made to official bodies and primarily concerned workplace conditions). For these reasons, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** to Mr. Palmer as to Count VII.

### F.    State Law Claims

In his Amended Complaint, plaintiff asserts a state-law claim against the City under the GWA. (Am. Compl. Count VI.) The City also asserts state-law counterclaims for breach of contract and unjust enrichment against plaintiff. (Answer to Am. Compl., Countercl., Counts I & II.)

72

Although dismissal of plaintiff's federal claims "does not deprive the Court of supplemental jurisdiction over the remaining state-law claims . . . under 28 U.S.C. § 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over non-diverse state-law claims, where the Court has dismissed all claims over which it had original jurisdiction." Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1352 (11th Cir. 1997). In exercising that discretion, "the court also can consider other factors. Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." Id. at 1353; see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

In light of the foregoing recommendations concerning plaintiff's federal claims, principles of judicial economy, convenience, fairness, and comity counsel the Court to **RECOMMEND** that supplemental jurisdiction over the state-law claims asserted by plaintiff and over the state-law counterclaims asserted by the City be declined. See 28 U.S.C. § 1367(c)(3); see also Carr v. Tatangelo, 156 F. Supp. 2d 1369, 1380-81 (M.D. Ga. 2001) (dismissing state-law claims in conjunction with granting summary judgment on federal constitution claims); Gibbs, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state-law claims should

73

be dismissed as well.")  Accordingly, plaintiff's GWA claim against the City and the City's state-law counterclaims against plaintiff should be **DISMISSED WITHOUT PREJUDICE**.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the undersigned **RECOMMENDS** that defendants' Motion for Summary Judgment [88] be **GRANTED** as to plaintiff's federal claims under the ADA, ADEA, FMLA, § 1983,  and the Rehab Act, and that those federal claims be **DISMISSED WITH PREJUDICE**.

The undersigned **FURTHER RECOMMENDS** that the District Judge **DECLINE** to exercise supplemental jurisdiction over plaintiff's state-law GWA claim against the City and the City's state-law breach of contract and unjust enrichment claims against plaintiff, and that these claims be **DISMISSED WITHOUT PREJUDICE**.

The undersigned **FURTHER RECOMMENDS** that plaintiff's Cross-Motion for Summary Judgment [93] be **DENIED AS MOOT**.

The Clerk is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED**, this 19th day of February, 2021.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE